COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss                                         SUPERIOR COURT
                                                     C.A. NO.

CHRISTOPHER LOVE and
ANGELA PETROPOULOS,

  *Plaintiffs,*

  v.                                                 **VERIFIED COMPLAINT
                                                     AND JURY DEMAND**

MARK CLAVETTE, NICHOLAS
MOCHI, LESTER SULLIVAN,
JONATHAN MARTINS, BRENDAN
PASCO, and THE CITY OF
CAMBRIDGE,

  *Defendants.*

## INTRODUCTION

1.   This is an action for money damages for violations of the Plaintiffs'

     constitutional rights brought pursuant to G.L. c. 12, 11I and 42 U.S.C. §

     1983, as well as tortious conduct as further described herein. Plaintiff

     Christopher Love alleges that Defendant Clavette illegally arrested him

     and, in concert with other members of the Cambridge Police Department,

     used excessive force in effectuating such arrest in violation of the

     Massachusetts Declaration of Rights and the Fourth and Fourteenth

     Amendments to the United States Constitution. Mr. Love further alleges

     that the Defendant City of Cambridge has demonstrated a custom and

policy of deliberate indifference to the rights of its citizens and violations of the equal protection provisions of both the state and federal constitution.

## JURISDICTION AND VENUE

2.   Jurisdiction is pursuant to G.L. c. 212, § 3 and the Court's concurrent jurisdiction over claims arising under federal law. See, e.g., Martinez v. California, 444 U.S. 277 (1980).

3.   This Court has personal jurisdiction over all Defendants under G.L. c. 223A, § 2 because all Defendants are either domiciled in or organized under the laws of the Commonwealth of Massachusetts. The Court also has personal jurisdiction over all Defendants pursuant to G.L. c. 223, § 3 because all Defendants committed acts or omissions within Massachusetts that caused injuries to Plaintiffs.

## PARTIES

4.   Plaintiff Christopher Love is a resident of Cambridge, Massachusetts.

5.   Plaintiff Angela Petropoulos is a resident of Cambridge, Massachusetts.

6.   Defendant Mark Clavette is a police officer for the City of Cambridge Police Department, acting under color of law at all times relevant to this Complaint, and is sued in his individual capacity as a police officer for the Defendant City of Cambridge.

7. Defendant Nicholas Mochi is a police officer for the City of Cambridge Police Department, acting under color of law at all times relevant to this Complaint, and is sued in his individual capacity as a police officer for the Defendant City of Cambridge.

8. Defendant Lester Sullivan is a police officer for the City of Cambridge Police Department, acting under color of law at all times relevant to this Complaint, and is sued in his individual capacity as a police officer for the Defendant City of Cambridge.

9. Defendant Jonathan Martins is a police officer for the City of Cambridge Police Department, acting under color of law at all times relevant to this Complaint, and is sued in his individual capacity as a police officer for the Defendant City of Cambridge.

10. Defendant Brendan Pasco is a police officer for the City of Cambridge Police Department, acting under color of law at all times relevant to this Complaint, and is sued in his individual capacity as a police officer for the Defendant City of Cambridge.

11. Defendant City of Cambridge is a municipality duly authorized under the laws of the Commonwealth of Massachusetts.

## FACTS

12. Christopher Love (hereafter "Plaintiff Love" or "Mr. Love"), is a forty-six-year-old resident of Cambridge.

3

13.     Mr. Love is employed as an art teacher at a private school.

14.     Mr. Love is a husband, as well as a father to two young children.

15.     Mr. Love is biracial (African-American and Caucasian) with a dark complexion.

16.     Angela Petropoulos is a resident of Cambridge and a working professional. She is married to Mr. Love and the mother of their two young children.

17.     On the afternoon of March 27, 2015, Mr. Love was returning from his work as a middle school art teacher to his home on Ellery Street in Cambridge.

18.     As Mr. Love approached the turn onto his street in the family car, a 2007 BMW X3, he saw blue lights flashing in his rearview mirror.

19.     Believing that the police officer was seeking to pull over another motorist, Mr. Love pulled his car aside to allow the officer to pass. Traffic, as well as snowbanks that had resulted from record-setting snowfall that year, prevented Mr. Love from pulling over to the side of the road.

20.     When the officer did not pass him and Mr. Love realized that he was the target of the stop, he motioned to the officer that he was continuing on to find a safe place to pull over out of the heavily-congested rush hour traffic on Broadway.

21.     Mr. Love took a right turn onto Ellery Street and slowly proceeded past
        large snow banks to his home at number 51, signaling and motioning
        repeatedly to the police officer along the way in an attempt to apprise him
        of his intentions.

22.     Mr. Love then pulled up his driveway and stopped the car in the rear
        parking lot behind his home. The total distance traveled at low speed from
        the location where the officer activated his lights was approximately one-
        tenth (0.1) of a mile.

23.     As Mr. Love parked the family car and waited with an open window for
        the officer to approach, he observed a Cambridge police officer, later
        identified as Mark Clavette ("Clavette"), sprinting up the driveway
        holding his utility belt.

24.     Clavette appeared extremely agitated and red-faced, and the first words he
        said, indeed shouted, to Mr. Love upon nearing the car were, "You're
        under arrest!"

25.     Clavette ordered Mr. Love out of his vehicle and, upon Mr. Love's
        immediate compliance, physically grabbed him.

26.     When Mr. Love recoiled and asked what was going on, Clavette, without
        warning, sprayed Mr. Love in the face with OC spray from a distance of
        approximately two feet.

27.   Clavette then immediately sprayed Mr. Love a second time from
approximately the same distance.

28.   Blinded and struggling to draw breath, Mr. Love was then seized from
behind in a chokehold by Clavette, who threw him violently to the ground.

29.   Mr. Love, who had, until minutes before, been going about his usual
routine and looking forward to a quiet evening with his family, suddenly
found himself thrown face-down to the ground with a police officer
kneeling on his back and screaming.

30.   At the time of the incident, Mr. Love was acutely aware that we as a
nation were in the grip of a crisis of excessive and deadly force visited
upon African-American men by police officers -- most of them white.
From Ferguson to New York City to Chicago to Cleveland, the fear of
being killed by a police officer simply for being a person of color was
palpable.

31.   Mr. Love was disoriented and terror-stricken. He was unable to breathe.
He felt certain he would suffocate or, worse yet, be shot dead in his own
driveway. He couldn't believe what was happening. A calm, quiet man by
nature, Mr. Love found himself screaming frantically to his wife, hoping
that she could somehow help. Hoping that perhaps the fact that she was
white would somehow help deescalate a situation spiraling out of control.
He called out to her for help.

32.    Mr. Love also pleaded with Clavette: "Don't kill me. Please do not kill me, don't kill me. I can't breathe." Neighbors heard his pleas and, no doubt believing that they were hearing a person in mortal peril, themselves called 911.

33.    At some point, Clavette placed a radio call for officer assistance.

34.    As Mr. Love struggled to keep his face off the ground and maintain his breathing, he found himself swarmed by other Cambridge police officers who physically battered and beat him.

35.    One officer, Nicholas Mochi ("Mochi"), immediately began striking Mr. Love in the head with a closed fist upon arriving on the scene. Other defendant officers Sullivan, Martins, and Pasco arrived and swarmed and battered Mr. Love. Ultimately, no less than twelve officers responded to the scene, and the quiet residential street was choked with police cars, lights flashing.

36.    Mr. Love was ultimately led, handcuffed, to a prisoner transport wagon in full view of his neighbors and family, causing him shame and humiliation.

37.    As a result of the assault by Cambridge police officers, Mr. Love suffered injuries to his eye, head, neck, shoulder, sternum, wrists, knee and back. Among these injuries were a concussion, contusions and abrasions, hemorrhaging of the eye, and trauma to his lower back.

38.     As a result of the assault and the injuries to his eye and head, Mr. Love
        experienced prolonged headaches, dizziness, and sensitivity to light.

39.     As a result of the assault, Mr. Love suffered an injury to his back that has
        left him in near-constant pain. A former athlete who coaches soccer, Mr.
        Love has needed to sharply curtail physical activity as a result of his
        injuries and the pain they generate. His sleep is regularly interrupted by
        this pain, and he experiences persistent aching even when just standing.
        He continues to undergo physical therapy in an effort to treat this lasting
        injury.

40.     In addition to the physical injuries inflicted by Cambridge police officers
        that day, Mr. Love has been forced to cope with lasting psychological
        impacts of the assault, including symptoms of hyperarousal and
        hypervigilance. The sound of police sirens generates immediate fear and
        anxiety, while once unremarkable activities such as traveling into Harvard
        Square, driving to his home, or venturing out after dark by car can all
        cause thoughts and memories of the assault to invade his thinking. Such
        lingering effects have persistently interfered with Mr. Love's day-to-day
        enjoyment of life. Mr. Love has even found himself dressing so as to
        minimize the possibility that he will be perceived as a threat by strangers.

41.     Throughout the assault on Mr. Love, his wife Angela was home with his
        youngest child. While holding their two-year-old child, Mrs. Petropoulos

8

witnessed her husband on the ground screaming for her help and pleading for his life while being beaten by police officers.

42.   As a direct result of witnessing the beating of her husband, Mrs. Petropoulos has suffered lingering psychological symptoms that have caused her significant suffering and forced her to seek professional treatment. In the aftermath of the incident, she experienced symptoms of anxiety, depression, and PTSD that interfered with her daily life. She was overwhelmed by a persistent and debilitating fear for the safety of her family in which relatively benign events -- a child leaping from a structure on a playground or an elevator door closing near a child -- would trigger a panic response with symptoms that included a racing heart, shortness of breath, and nausea. For months following the attack, she was unable to sleep for more than three hours at a time. She had no appetite. Like Mr. Love, she would jump at the sound of a police siren and found her sense of safety and security at home shattered. Her relationships -- including her relationship with her husband -- suffered, and she found her plans to advance her career thwarted.

43.   Mr. Love was ultimately charged with one count each of Operating an Unregistered Motor Vehicle, Refusal to Produce a License, Failing to Stop for Police, and Resisting Arrest. The charge of Resisting Arrest is not listed on the ticket issued to Mr. Love, but appears on the subsequently-filed Application for a Criminal Complaint.

44.    Mr. Love was acquitted of charges of resisting arrest and refusing to
       provide a license. He was found civilly responsible for operating an
       unregistered motor vehicle and guilty of failing to stop for police.

45.    At least as far back as April of 2002, the City of Cambridge was aware of
       Mr. Clavette's propensity for physical violence. At one point during that
       time period, Mr. Clavette started a physical altercation while off-duty at a
       bar, verbally invoking his status as a Cambridge police officer while
       accosting a private citizen patronizing the bar. The City was further aware
       that Mr. Clavette made material, self-serving misrepresentations in his
       own report(s) submitted following the incident. The City is further aware
       that, while the private citizens involved in the altercation were charged
       and prosecuted, no police officer faced any discipline as a result of their
       conduct that evening.

46.    The prior conduct of Mr. Clavette and other named defendants in this case
       has resulted in dozens of use-of-force reports dating back to 2000,
       including 31 involving either Clavette or Mochi that led to the subsequent
       filing of charges of resisting arrest.

47.    Upon information and belief, it has been the practice of these officers and
       the Cambridge Police Department to file charges, including charges of
       resisting arrest, as part of a design to shield involved officers from liability
       for injuries inflicted upon arrestees where there exists the potential for an
       excessive force claim to be brought against the officer(s).

10

48.    In use-of-force reports obtained from the City, the precipitating
       circumstance and degree of force vary. The outcome does not; in each
       instance, the involved officer is invariably found to have employed an
       appropriate amount of force -- often by way of a brief, conclusory
       statement by a supervisor with no indication of investigation beyond a
       review of the report and narrative submitted by the officer themselves.

49.    Analysis of those same reports reveals that approximately 62% of those
       reports involved defendants belonging to a minority racial group; 57% of
       the reports involved Black defendants.

50.    Black citizens of Cambridge represent 11% of the population of the city.

51.    The City of Cambridge has a custom and practice of tolerating misconduct
       by its officers, both generally and with respect to named defendants in this
       case. Such custom and practice is demonstrated by its repeated failure to
       take suitable action against officers accused of excessive force and/or false
       arrest. The City has repeatedly failed to adequately investigate complaints
       and to properly discipline officers who engage in misconduct.
       Additionally, the sheer volume and magnitude of such complaints
       demonstrates a failure to supervise and train that is deliberately indifferent
       to the constitutional rights of citizens.

<u>COUNT I</u>
<u>FALSE ARREST</u>
<u>CLAVETTE</u>

52.    Plaintiffs restate the allegations set forth above and incorporate each as if
       fully set forth herein.

53.    Lacking probable cause to believe that requirements for a misdemeanor
       arrest had been met under Massachusetts law[i], Defendant Clavette
       nevertheless proceeded to falsely arrest Mr. Love for failure to stop for a
       police officer. He subsequently charged Mr. Love with failing to produce
       a license and resisting arrest.

54.    Mr. Love was later acquitted of the charges of failing to produce a license
       and resisting arrest.

55.    As a direct and proximate result of Clavette's decision to falsely arrest Mr.
       Love, Mr. Love experienced bodily suffering and emotional distress,
       including shame, humiliation, and mental anguish.

---

[i] <u>See</u>, <u>e.g.</u>, <u>Commonwealth</u> v. <u>Ubilez</u>, 88 Mass.App.Ct. 814, 820-821 (2016) ("in the absence of statutory authority, a police officer may make a warrantless arrest for a misdemeanor *only* where it (1) involves a breach of the peace, (2) is committed in the presence or view of the officer ... and (3) is still continuing at the time of the arrest...") (<u>citing</u> <u>Commonwealth</u> v. <u>Conway</u>, 2 Mass.App.Ct.547, 550 (1974)) (emphasis added, internal quotation marks omitted). In order to find a breach of the peace, an act "must at least threaten to have some disturbing effect on the public." <u>Id</u>. at 821 (<u>citing</u> <u>Commonwealth</u> v. <u>Baez</u>, 42 Mass.App.Ct. 565, 570 (1997)).

## COUNT II
## VIOLATION OF G.L. c. 12, § 11I (Civil Rights Act)
## CLAVETTE

56. Plaintiffs restate the allegations set forth above and incorporate each as if fully set forth herein.

57. Lacking probable cause to believe that requirements for a misdemeanor arrest had been met under Massachusetts law, Defendant Clavette nevertheless proceeded to falsely arrest Mr. Love for failure to stop for a police officer. He subsequently charged Mr. Love with failing to produce a license and resisting arrest. In so doing, Clavette employed direct, violent physical force that resulted in Mr. Love being forcibly restrained.

58. Such force and restraint were employed to deprive, and did so deprive, Plaintiff Love of his right to be free from unreasonable seizure as guaranteed by art. XIV of the Massachusetts Declaration of Rights and the Fourth and Fourteenth Amendments to the United States Constitution.

59. As a result of Clavette's actions, Mr. Love's civil rights were violated.

## COUNT III
## VIOLATION OF 42 U.S.C. § 1983 (USE OF FORCE AND ARREST)
## CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO

60. Plaintiffs restate the allegations set forth above and incorporate each as if fully set forth herein.

61. During the arrest of Mr. Love, the Defendants employed an excessive and unreasonable degree of physical force against him.

62.     By these actions, the Defendants, acting under color of law, deprived the

Plaintiff of his right to be free from unreasonable seizures and to be free

from the use of excessive force, all in violation of 42 U.S.C. and his

Fourth and Fourteenth Amendment rights as guaranteed by the United

States Constitution.

### COUNT IV
### VIOLATION OF G.L. c. 12, § 11I (Civil Rights Act)
### CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO

63.     Plaintiffs restate the allegations set forth above and incorporate each as if

fully set forth herein.

64.     By the actions described in the above paragraphs, the Defendants

employed an excessive and unreasonable degree of force against Mr.

Love. In so doing, Defendants deprived Mr. Love of his right to be free

from unreasonable seizures and from excessive force in violation of his

rights under art. XIV of the Massachusetts Declaration of Rights and the

Fourth and Fourteenth Amendments to the United States Constitution.

### COUNT V
### ASSAULT AND BATTERY
### CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO

65.     Plaintiffs restate the allegations set forth above and incorporate each as if

fully set forth herein.

66.   As therein described, Defendants committed the common law torts of
      assault and battery against Plaintiff Love and thereby caused bodily
      injuries and mental suffering as set forth above.

### COUNT VI
### MALICIOUS PROSECUTION
### CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO

67.   Plaintiffs restate the allegations set forth above and incorporate each as if
      fully set forth herein.

68.   Defendants instituted criminal proceedings against Mr. Love on charges of
      resisting arrest and refusing to provide a license that were lacking in
      probable cause. Defendants maliciously instituted and continued pursuit of
      these charges not to secure the proper adjudication of such charges, but
      rather for the improper purposes of retaliation and/or attempting to shield
      themselves from liability for their wrongful conduct.

69.   Whereas each of the other charges against Mr. Love carried a maximum
      penalty of a $100 fine, the charge of resisting arrest carried a maximum
      penalty of 2 1/2 years in a jail or house of correction, a fine of $500, or
      both.

70.   As a direct and proximate result of defendants wrongful conduct, Plaintiffs
      were forced to expend a substantial sum to mount a defense to the charges
      against Mr. Love and were subjected to protracted mental anguish and
      suffering.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO

71.     Plaintiffs restate the allegations set forth above and incorporate each as if
fully set forth herein.

72.     As described above, defendants engaged in extreme and outrageous
conduct during and after the arrest of Mr. Love. Defendants knew or
should have known that emotional distress was likely to result from such
conduct and, as a direct and proximate cause of this conduct, Mr. Love did
in fact suffer severe emotional distress.

## COUNT VIII
## VIOLATION OF 42 U.S.C. § 1983
## CITY OF CAMBRIDGE

73.     Plaintiffs restate the allegations set forth above and incorporate each as if
fully set forth herein.

74.     By and through the facts and events described above, the City of
Cambridge has demonstrated a custom and policy of indifference to the
rights of its citizens by:

    a.  Tolerating customs and policies through which police officers
        violate the constitutional rights of citizens through use of excessive
        force and unlawful seizures;

b. Failing to take adequate disciplinary action against officers who violate the rights of citizens by using excessive force and making unlawful seizures;

c. Failing to adequately supervise and/or discipline officers who use excessive force and make unlawful seizures;

d. Failing to adequately train its police officers on the proper use of force and arrest procedures, and by providing its officers with dangerous equipment with the potential to inflict injury or death and failing to properly train its officers on the appropriate use thereof;

e. Failing to both adequately investigate and remediate following incidents involving the use of force and complaints of excessive force and unlawful seizures.

## COUNT IX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO

75. Plaintiffs restate the allegations set forth above and incorporate each as if fully set forth herein.

76. As described above, defendants engaged in extreme and outrageous conduct during and after the arrest of Mr. Love, including physically beating him and relentlessly pursuing false charges against him. Defendants knew or should have known that emotional distress was likely

to result from such conduct, exhibited indifference as to the likely effect of
such conduct on family members who witnessed the events, and, as a
direct and proximate cause of such conduct did cause Mrs. Petropoulos to
suffer severe emotional distress.

### COUNT X
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO,
### CITY OF CAMBRIDGE

77.   Plaintiffs restate the allegations set forth above and incorporate each as if
fully set forth herein.

78.   Defendants had a duty to prudently exercise the power of arrest conferred
upon them, including refraining from the employment of excessive force
in the course of such exercise. Nevertheless, Defendants engaged in
extreme and outrageous conduct during and after the arrest of Mr. Love,
including physically beating him and relentlessly pursuing unfounded
charges against him. Defendants knew or should have known that
emotional distress to family members was likely to result from such
conduct and, as a direct and proximate cause of such conduct did cause
Mrs. Petropoulos to suffer severe emotional distress, including symptoms
of anxiety, depression and PTSD manifested by a racing heart, shortness
of breath, nausea, loss of sleep, and loss of appetite.

79.   As a result of Defendants' negligence, Mrs. Petropoulos was made to
experience conscious pain and suffering, loss of earning capacity, loss of
enjoyment of life, and medical expenses.

**COUNT XI**
**LOSS OF CONSORTIUM**
**CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO**

80. Plaintiffs restate the allegations set forth above and incorporate each as if fully set forth herein.

81. As a direct and proximate result of the tortious conduct directed at Mr. Love, including but not limited to the intentional infliction of emotional distress, malicious prosecution, and assault and battery upon him, Mrs. Petropoulos has been deprived of the full society and companionship of her spouse.

**COUNT XII**
**VIOLATION OF RIGHT TO EQUAL PROTECTION OF LAW**
**CITY OF CAMBRIDGE, CLAVETTE, MOCHI, SULLIVAN, MARTINS, PASCO**

82. Plaintiffs restate the allegations set forth above and incorporate each as if fully set forth herein.

83. Plaintiff, who is biracial with a dark complexion, was subject to racially-discriminatory policing, including the disparate use (and subsequent approval) of force by Defendants, in violation of the guarantees of equal protection of the laws contained within the Massachusetts Declaration of rights, art. I and X.

84. An evaluation of historical use of force reports dated between 2000 and 2015 and provided by the City in response to a discovery order during the prosecution of Mr. Love reveals that approximately 62% of the reports

involved defendants belonging to a minority racial group. 57% of the reports involved defendants who were Black.

85.     According to 2010 census data, 11.7% of Cambridge residents are Black. Those same data show that 66% of Cambridge residents are White.

86.     This pattern of racially-disparate police activity -- including but not limited to reported use of force incidents -- by Cambridge police officers was met by institutional tolerance, acquiescence, and, ultimately, approval that was in some cases tacit and in others explicit.

WHEREFORE, the Plaintiffs request that this Court award:

1. Compensatory damages against all Defendants, jointly and severally;

2. Punitive damages against all individual Defendants;

3. Award the costs of this action, including reasonable attorney's fees; and

4. Award such further relief as this Court may deem necessary and appropriate.

A trial by jury is hereby demanded.

Respectfully submitted,

CHRISTOPHER LOVE and
ANGELA PETROPOULOS.

By their attorneys,

SWOMLEY & TENNEN, LLP

Dated: 26 March 2018

John G. Swomley, BBO #551450
Matthew E. Cole, BBO # 688911
Swomley & Tennen, LLP
50 Congress Street | Sixth Floor
Boston, MA 02109
617-227-9443
617-227-8059 (fax)
jswomley@swomleyandtennen.com
mcole@swomleyandtennen.com

## VERIFICATION

The undersigned do hereby depose and state that they have read the foregoing complaint and the allegations contained therein are true and correct as to those matters of which they have personal knowledge, and as to other matters, the foregoing is based upon records and information reasonably available to them.

Signed under the pains and penalties of perjury this 25 of March, 2018.


_____
Christopher Love


_____
Angela Petropoulos